[No. 15316. Department One. January 28, 1920.]

## H. A. HENRIKSON, *Respondent,* v. PACIFIC COAST PACKING COMPANY, *Appellant.*[1]

SALES (3)—CONTRACTS (40, 41)—VALIDITY—SALES DISTINGUISHED FROM EMPLOYMENT—VIOLATION OF FEDERAL FOOD CONTROL ACT. A contract between a packing company and the owner of a fishing vessel whereby the owner of the vessel agreed to fish in certain waters and the company agreed to purchase the fish, paying so much per fish for all fish caught and guaranteeing a certain sum for the catch, is primarily a contract of sale and not of employment; and any guaranty of price in excess of the prices fixed by the Federal food control act is unenforceable, since such act is controlling (MITCHELL, J., dissenting).

Appeal from a judgment of the superior court for King county, Ralston, J., entered December 28, 1918, in favor of the plaintiff, upon sustaining a demurrer to the answer and the refusal of the defendant to plead further, in an action on contract. Reversed.

*Bogle, Merritt & Bogle,* for appellant.

*G. E. Steiner,* for respondent.

MAIN, J.—The purpose of this action was to recover the balance claimed to be due under the guaranty clause of a written contract. The defendant answered the complaint by certain admissions and denials and an affirmative defense. To the affirmative defense, a demurrer was interposed and sustained by the trial court. The defendant declined to plead further and elected to stand upon the defense as pleaded. Thereupon judgment was entered against the defendant as prayed for in the complaint, and from that judgment the appeal is prosecuted.

The facts alleged in the complaint and in the affirmative defense thereto will be summarized, so far as

[1] Reported in 187 Pac. 377.

necessary to present the controlling question. The complaint alleged that the respondent was the owner of the gas boat Taholah, a purse seine fishing vessel, and was himself an experienced fisherman; that the appellant was a corporation organized under the laws of the state of Washington; that, on or about the 6th day of June, 1918, the parties entered into a written contract, as follows:

"This agreement entered into at Seattle, Washington, this 6th day of June, 1918, between Pacific Coast Packing Co., hereinafter referred to as 'Company,' and H. A. Henrikson, owner of the seine boat 'Taholah'

"Witnesseth that H. A. Henrikson hereby agrees to fish in the waters of southeastern Alaska for the Pacific Coast Packing Co. exclusively during the season of 1918, and the Pacific Coast Packing Co. hereby agrees to purchase such fish so caught by H. A. Henrikson and the purse seine boat 'Taholah.'

"It is further agreed that H. A. Henrikson shall fish throughout the season of the run of humpback salmon in southeastern Alaska, the Pacific Coast Packing Co. agrees to take delivery of all fish so caught and delivered by the purse seine boat 'Taholah' to the company's plant located in Cleaveland Passage, paying for same at the rate of five cents for each and every good humpback salmon, and the going price of the district for all other fish so caught and delivered to the plant of the company.

"H. A. Henrikson agrees, whenever possible, to turn over all fish taken by the seine boat 'Taholah' to the plant of the company, but in the event that he is unable to make delivery to the plant before the fish might spoil, he is to be permitted to dispose of the fish elsewhere. Amount received by H. A. Henrikson for fish so sold shall apply upon this agreement.

"The Pacific Coast Packing Co. hereby agrees that in case H. A. Henrikson does not catch enough of the various kinds of fish during the season of 1918 to the amount of $500 per share of ten shares, they will pay

the difference between the amount earned and $500 per share of ten shares.

"The company agrees to furnish free oil for the operation of the purse seine boat 'Taholah' for the voyage from Seattle to the company's plant and for the return voyage to Seattle.

"Witnessed:                  Seattle Coast Packing Co.
"H. C. Barney.        By W. S. Clark, Sec. and Treas.
"J. D. Clark.            Accepted  H. A. Henrikson
         "Owner of Purse Seine Boat 'Taholah.' ''

That, in pursuance of this agreement, respondent went to the waters bordering the Territory of Alaska with his fishing vessel and fished during the season of 1918; and that for the fish caught he received the sum of $1,824.15. Prayer is made for a judgment for the difference between this sum and the sum of $5,000 mentioned in the written contract, or $3,175.85. The affirmative defense alleged, after admitting the making of the contract set out in the complaint, that it owned and operated a salmon canning plant located on Frederick Sound, in the southeastern portion of the Territory of Alaska; that the respondent went to Alaska during the season of 1918 and caught and delivered to the appellant a certain quantity of salmon; that, on August 10, 1917, the Congress of the United States duly passed, and thereafter the President of the United States approved, an act entitled: "An act to provide further for the national security and defense by encouraging the production, conserving the supply, and controlling the distribution of food products and fuel," which act is known as the Federal food control act; that, at the time of the execution of the contract upon which the respondent's action is based, the act was in full force and effect, and has since this time remained in force and effect; that, in the act, the President of the United States was given full power and authority to carry out and enforce the

provisions thereof, and to make such regulations and issue such orders as were essential for that purpose; that, under the power and authority so vested in the President, and long prior to the making of the contract between the parties to this action, there was duly created a food administration of the United States, for the purpose of carrying out and enforcing the provisions and purposes of the act; that, prior to the making of the contract between the parties to this action, the United States food administration, under and by virtue of the act, and with the approval of the President, determined and fixed the prices of salmon which the appellant had the right to pay and which the fisherman had the right to receive; that the respondent had been paid for all the salmon caught and delivered to the appellant the prices fixed in pursuance of the Federal food control act; and that the reason for not paying the balance claimed to be due under the guaranty clause in the contract was that to do so would be to pay more for the fish received than the prices fixed under and by authority of the food control act. It thus appears that all the fish caught by the respondent during the season of 1918 and delivered to the appellant had been paid for at the prices fixed by the United States food administrator.

The controlling question is whether the guaranty clause in the contract was an unlawful undertaking as violating the Federal act, if it resulted in paying more for the fish than the prices fixed by the food administrator. The respondent claims that the contract, properly construed, is one of employment, and therefore does not come within the provisions of the act. The appellant contends that the contract is one for the sale of fish, and that the prices fixed by the Federal food administrator are controlling, and that an agreement to pay more would be illegal and void.

Which of these contentions is correct depends upon the construction to be given to the contract. It must be admitted that in the contract there are certain provisions which would indicate that it was one of employment, while there are other provisions that would show that it was a contract for the sale of the salmon to be caught during the season mentioned. A careful consideration of the contract leads to the conclusion that its dominating characteristics are those of a sale and not of employment. Its primary purpose was for the sale to the appellant of the fish caught by the respondent. By the agreement the appellant was required to "purchase" the fish caught by the respondent and the boat, of which he was the owner. The appellant agreed "to take delivery of all fish so caught" at its plant, "paying for the same" at so much per fish. The contract does not provide for paying the respondent, the vessel, or its crew for the time spent as appellant's employees. It does purport, when all of its provisions are considered, to be a contract for the purchase of fish at the prices specified.

If the respondent can recover, under the guaranty clause in the contract, more than the prices fixed by the Federal food administration, the law under which such prices were so fixed would be nullified. The purpose of the food control act, as applied to the subject-matter of the contract here in controversy, was to insure fishermen a reasonable price for the fish they caught, enable the cannerymen to secure an adequate supply of fish for canning purposes at such a reasonable price as would enable them to sell the same at a reasonable price to the purchasing public and make a fair profit. If the act could be avoided by contracts such as the one here in question, its provisions would be largely defeated. To hold that this contract was one of employment, and therefore not subject to the

regulations of the Federal food administration, would be to put a premium upon subterfuge. While the food control act remains in force and effect, its provisions must be held controlling, and contracts made in violation thereof are unenforcible. The trial court was in error in sustaining the demurrer to the affirmative defense, because the facts there pleaded would prevent a recovery.

The judgment will be reversed, and the cause remanded with directions to the superior court to overrule the demurrer to the affirmative defense in the answer.

HOLCOMB, C. J., PARKER, and MACKINTOSH, JJ., concur.

MITCHELL, J. (dissenting) — I dissent. I have no doubt the contract was made in the best of faith. Appellant alleges it is a domestic corporation. Manifestly, in addition to its prospects of profits, with commendable zeal and catching the spirit of the times, it determined, even at some financial risk, to commence or continue operating a cannery for the support of the government's needs for the increased production and preparation of food, and made this contract; and now, after it appears to have been faithfully performed by the other party, it seeks to hide behind the government and, through a strained construction of its contract, escape from the effects of its solemn obligation.

The essential and controlling error in the majority opinion as to the purpose of the contract — which adopts the contention of appellant — lies in its conclusion: "Its primary purpose was for the sale to the appellant of the fish caught by the respondent." On the contrary, the contract is entitled to no other construction than that of an attempt on the part of the

appellant to make a dependable arrangement for a needed supply of fish for its cannery and payment to respondent by the plan of the number of fish caught and delivered, together with an assurance against possible loss incidental to the hazard of the undertaking. There can be no question but that, under the terms of the contract, if respondent had caught and delivered to the appellant such a number of fish that the amount to be paid respondent had exceeded $5,000, appellant would have been compelled, and probably pleased, to pay such excess, with the result of eliminating from the contract any further need for the assurance of $5,000; thus demonstrating that the assurance of $5,000 was in no sense a fixing of the price of the fish, but intended only to protect the respondent against possible loss in order to induce him to undertake the catching of the fish for the cannery. If the theory of appellant is correct, it means that, if respondent's catch, at regulation prices, had equaled or exceeded $5,000, the contract would be unassailable; but if the catch, at regulation prices, were less than $5,000, as was the case here, then the contract is wholly illegal because against public policy. That is, the test of the validity of the contract, upon its being carried out, is found in the final result, theretofore uncertain, which no one could have foreseen or estimated with reasonable certainty. Assume faithful service on the part of the respondent through the whole period covered by the contract had resulted in catching no fish; certainly appellant could be made to pay its obligation of $5,000. To the extent fish were caught and delivered, the contract price (subject to the government's control) fixed the compensation for the services. But for the risks incidental to so uncertain an enterprise, provision was made by the assurance of $5,000. The price was certain, or made so by the government; the risk was un-

certain. No one wishes for an assurance that the specified due date of a promissory note will arrive, for that is certain; but often one exacts a guaranty or assurance that payment will be made, for that has the element of uncertainty. So in this case the balance of the $5,000 sued for is a promise to pay, having for its consideration the risk undertaken by the promisee, and is wholly outside of and beyond the matter of the price to be paid for the fish. Another view supporting the claim that the consideration for the promise was the risk assumed is that, if the respondent had wholly or partially failed to perform his part of the agreement (which is not the case here), to that same extent it would have afforded a defense to the action on the promise to pay $5,000.

And again, the contract provides that, if necessary to prevent spoiling, fish caught might be sold to other parties, in which event the amounts thus received should be applied on the agreement. What agreement? Surely not the agreement to pay for fish actually delivered to appellant; thus distinguishing appellant's agreement to at least divide the risk, wholly independent of its other agreement to pay as the fish were delivered. If appellant's idea of the contract is right, then one under a contract providing therefor would not be allowed to pay the transportation of men from Seattle to its cannery in Alaska, and put them, or others already there, to work on its own fishing boats with the understanding that they would be paid the regulation price at which fish were sold; because, forsooth, the expense incurred, together with the price to be paid for the fish, would exceed the price fixed by the government, and therefore the contract would be void. Or, as pertinently remarked in the argument of the case, it is difficult to understand why the cost of oil furnished by appellant for the operation of the

fishing boat from Seattle to the company's plant and return, according to the provisions of the last section of the contract, was not taken out of the amount due according to the number of fish appellant did receive.

In the fifth section, the contract provides that, if respondent does not catch enough fish to earn $5,000, appellant will pay the difference. That is, if respondent's earnings by the plan of paying so much per fish should be less than $5,000, then, to compensate him for his loss, appellant agreed, as an incident to the risks of its own cannery business, devoted to the pursuit of profit as well as the needs of the government, to pay the difference. That is the matured promise this suit is brought to enforce, and, in my opinion, it is a perfectly lawful and enforcible obligation.